The PEOPLE of the State of Colorado,
Plaintiff–Appellee

v.

Edward MONTOUR, Jr., Defendant–
Appellant.

No. 02SA365.

Supreme Court of Colorado,
En Banc.

April 23, 2007.

Rehearing Denied May 14, 2007.

Carol A. Chambers, District Attorney, Eighteenth Judicial District, John Topolnicki, Chief Deputy District Attorney, Douglas County Office, Castle Rock, Colorado, Paul Wolff, Chief Deputy District Attorney, Arapahoe County Office Centennial, Colorado, John W. Suthers, Attorney General, Susan J. Trout, Special Deputy District Attorney and First Assistant Attorney General, Denver, Colorado, Attorneys for Plaintiff–Appellee.

Judy L. Lucero, Denver, Colorado, Martinez Law, LLC, Esteban A. Martinez, Longmont, Colorado, Alternate Defense Counsel for Defendant–Appellant.

John W. Suthers, Attorney General, Paul E. Koehler, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Amicus Counsel Colorado Attorney General.

Killmer, Lane & Newman LLP, David A. Lane, Denver, Colorado, Attorneys for Amicus Curiae Colorado Criminal Defense Bar.

Douglas K. Wilson, Colorado State Public Defender, Jason C. Middleton, Deputy State Public Defender, Denver, Colorado, Attorneys for Amicus Curiae Colorado State Public Defender.

Colorado District Attorney's Council, David J. Thomas, Executive Director, Denver, Colorado, Scott W. Storey, District Attorney, First Judicial District, Donna Skinner Reed, Chief Appellate Deputy District Attorney, Golden, Colorado, Attorneys for Amicus Curiae Colorado District Attorney's Council.

Justice BENDER delivered the Opinion of the Court.

## I. Introduction

In this appeal, we exercise our jurisdiction to conduct an independent review of the death sentence of Edward Montour, Jr. We hold that Colorado's death penalty statute cannot deprive the defendant of his Sixth Amendment jury trial right on the facts essential to the death penalty eligibility determination when that defendant pleads guilty. Here, Montour pled guilty and pursuant to the Colorado death penalty statute, his guilty plea automatically waived his right to have a jury determine his sentence. We hold that the statute unconstitutionally links the waiver of a defendant's jury sentencing right to his guilty plea. Hence, we affirm Montour's guilty plea and apply the severability clause in the death penalty statute to excise the unconstitutional language in the death penalty statute. We reverse Montour's death sentence and remand this case to the district court. On remand, the district court must set a new sentencing hearing before a newly impaneled jury unless Montour waives his right to jury sentencing. To be valid, Montour's waiver of his Sixth Amendment right must be knowing, voluntary, and intelligent, and not linked to his guilty plea.

Montour pled guilty to the first-degree murder of a correctional officer at the Limon Correctional Facility, where he was serving a life sentence without the possibility of parole for the first-degree murder of his infant daughter. The district court judge sentenced Montour to death under subsection 18–1.3–1201(1)(a), C.R.S. (2006), which states that a capital defendant waives his right to a jury trial on sentencing facts when he pleads guilty.

We do not disturb Montour's guilty plea as he does not challenge its validity. Instead, we focus our independent review on the public interest and the manner in which the death penalty was imposed pursuant to subsection 18–1.3–1201(6)(a). Specifically, we review the sentencing procedures in subsection 18–1.3–1201(1)(a) for fundamental fairness. We hold that the provision in subsection 18–1.3–1201(1)(a) requiring a defendant to waive his Sixth Amendment right to a jury trial on all facts essential to the death penalty eligibility determination when he pleads guilty violates the Sixth Amendment. A defendant's jury trial right on these sentencing facts may not be forfeited automatically when he pleads guilty to a capital crime.

In *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the United States Supreme Court clarified that the Sixth Amendment right to a jury trial on sentencing facts, recognized in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), is a right independent of the right to a jury trial on the guilt phase. *See also Lopez v. People,* 113 P.3d 713 (Colo.2005) (applying the holdings of *Apprendi* and *Blakely*); *Woldt v. People,* 64 P.3d 256 (Colo. 2003) (applying the *Ring* holding). In *Blakely,* the Court held that the Sixth Amendment entitles a defendant to jury fact-finding on all facts essential to the punishment at sentencing even when he pleads guilty. 542 U.S. at 313–14, 124 S.Ct. 2531. Hence, the right to a jury trial on all facts essential to the punishment during sentencing is not waived automatically by the act of pleading guilty. We note that the General Assembly added the

waiver provision in subsection 1201(1)(a) two years before *Blakely*, such that it was unaware of the independent nature of the right to a jury trial on sentencing facts when it created the waiver provision.

Under Colorado law, the facts essential to punishment in a death penalty case include the facts necessary to determine death penalty eligibility under subsection 18–1.3–1201(2)(a). *Woldt*, 64 P.3d at 266–67. The death penalty eligibility determination includes three steps: finding aggravating factors, finding mitigating factors, and weighing aggravating factors against mitigating factors. By the terms of subsection 18–1.3–1201(2)(a), a jury must determine death penalty eligibility and complete the fourth step— selection of a sentence—unless a defendant waives the right to a jury trial on sentencing.

While a defendant may waive the right to a jury trial on sentencing facts, this waiver must be knowing, voluntary, and intelligent. Subsection 18–1.3–1201(1)(a) is facially unconstitutional because it fails to effect a knowing, voluntary, and intelligent waiver, as the waiver is automatic when a defendant pleads guilty. In this case, although Montour understood that he was waiving his right to a jury trial on sentencing facts by entering a guilty plea, his waiver of his Sixth Amendment right was infected with the same constitutional infirmity as subsection 18–1.3–1201(1)(a)—the waiver of his Sixth Amendment right was inextricably linked to his guilty plea.

To cure this Sixth Amendment violation, we sever the unconstitutional language in section 18–1.3–1201. After severing that language, we are left with a coherent statute that says if the death sentence of a defendant who pleads guilty is held invalid, then the case shall be remanded to the district court for a new sentencing hearing before a jury unless the defendant waives his right to jury sentencing.

We reverse Montour's death sentence and remand this case to the district court. On remand, the district court must set a new sentencing hearing before a newly impaneled jury unless Montour waives his right to jury sentencing. To be valid, Montour's waiver of his Sixth Amendment right must be knowing, voluntary, and intelligent, and not linked to his guilty plea. Only after a valid waiver may the district court conduct the sentencing hearing.

## II. Jurisdiction

Subsection 18–1.3–1201(6)(a) establishes our jurisdiction over this case, providing "[w]henever a sentence of death is imposed upon a person pursuant to the provisions of this section, the supreme court shall review the propriety of that sentence." *See also* C.A.R. 4(d)(1);[1] *People v. Harlan*, 8 P.3d 448, 498 (Colo.2000) (conducting required independent review of a death sentence rendered after jury trial and sentencing); *People v. Dunlap*, 975 P.2d 723, 764 (Colo.1999) (same); *People v. Davis*, 794 P.2d 159, 212 (Colo.1990) (same); *People v. White*, 870 P.2d 424, 426–27 & n. 1 (Colo.1994) (conducting independent review of a death sentence based in part on guilty pleas). This Court's independent review serves as an additional safeguard to ensure that the death penalty is not imposed arbitrarily and capriciously in violation of the Eighth Amendment. *See Gregg v. Georgia*, 428 U.S. 153, 198, 204–06, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Furman v. Georgia*, 408 U.S. 238, 313, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (White, J., concurring).

Our duty to conduct this independent review is separate and distinct from our appellate review. *See* § 18–1.3–1201(6)(a) ("The supreme court shall *combine* its review pur-

---

1. Our appellate rules of procedure in C.A.R. 4(d)(1) provide for independent review in virtually the same language as subsection 18–1.3–1201(6)(a):

Availability of Review. Whenever a sentence of death is imposed, the Supreme Court shall review the propriety of the sentence, having regard to the nature of the offense, the character and record of the offender, the public inter-

est, and the manner in which the sentence was imposed, including the sufficiency and accuracy of the information upon which it was based.

If the Supreme Court determines that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, or that, as a matter of law, the sentence is not supported by the evidence, a sentence of death shall not thereafter be imposed.

suant to this subsection (6) with consideration of any appeal ....") (emphasis added). In *Dunlap*, we recognized our dual role as "an appellate court reviewing trial court proceedings and ... independent arbiters to review the propriety of the sentence." 975 P.2d at 765.

Further, subsection 18–1.3–1201(6)(a) mandates our review as independent arbiters. Subsection 18–1.3–1201(6)(a) states that the supreme court "shall review" the sentence when death is imposed. *See also* C.A.R. 4(d)(1) (same); *Harlan*, 8 P.3d at 498 (stating that "[w]e are *obligated* by statute to independently review"); *Dunlap*, 975 P.2d at 764 (recognizing that we were undertaking independent review "mandated" by the statute); *Davis*, 794 P.2d at 212 (acknowledging that the court "is required" to conduct the independent statutory review). Unlike direct appeal, which is a right a defendant may waive, a defendant cannot waive our independent review of his death sentence.[2]

Subsection 18–1.3–1201(6)(a) requires us to review "the propriety of that sentence, having regard to the nature of the offense, the character and record of the offender, the public interest, and the manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based." Here, we undertake the review mandated by the statute with regard to the third consideration: the public interest and the manner in which the sentence was imposed.

When considering the public interest in the imposition of the death penalty in this case, our analysis is confined to whether the proceedings sentencing Montour to death were fundamentally fair. *Dunlap*, 975 P.2d at 765. The public interest demands that the trial and sentencing proceedings of a person facing death be fundamentally fair. *Id.* Hence, we review the statutory scheme under which

the court sentenced Montour, subsection 18–1.3–1201(1)(a).

Due to the uncertainty that *Apprendi*, *Ring*, and *Blakely* created regarding a defendant's Sixth Amendment right to jury sentencing, we issued an order requesting that the parties brief the applicability and constitutionality of subsection 18–1.3–1201(1)(a). This subsection provides in relevant part that when a defendant enters a guilty plea to a class 1 felony, the court must conduct the sentencing hearing because when a defendant pleads guilty he automatically waives his right to a jury trial on sentencing facts:

> [I]f the defendant pled guilty [to a class 1 felony], the [sentencing] hearing shall be conducted before the trial judge. The court shall instruct the defendant when waiving his or her right to a jury trial or when pleading guilty, that he or she is also waiving his or her right to a jury determination of the sentence at the sentencing hearing.

In addition to the parties, we invited a number of organizations to file amicus curiae briefs: the Colorado Attorney General, the Colorado District Attorney's Council, the Colorado Public Defender, the Colorado Criminal Defense Bar, the Colorado Alternate Defense Counsel, and the Colorado Bar Association. The parties, as well as amici from the Colorado Attorney General's Office, the Colorado District Attorney's Council, the Colorado Criminal Defense Bar, and the Colorado Public Defender's Office, submitted briefs for our review. Having reviewed each of these arguments, we now turn to the facts of this case.

### III. Facts and Proceedings Below

The district court sentenced Edward Montour, Jr. to death for killing a correctional officer while he was serving a life sentence without parole at the Limon Correctional

---

2. The record is unclear as to whether Montour waived his right to direct appeal of his death sentence. On October 30, 2003, he sent a letter to this Court stating his intention to "waive all waivable appeals in the direct appeal process," but later changed his mind stating in another letter dated May 16, 2006, that, "I Edward Montour Jr. do hereby withdraw my request to waive appeals." Montour never tried to waive this Court's independent review. In the letter dated October 30, 2003, containing Montour's initial waiver of his direct appeal, he stated, "I understand that under Colorado Statute 18–1.3–1201(6),(7),(8), the supreme court is mandated to follow said statute. Moreover, my waiver has no effect on the courts review of my sentence." In any case, Montour cannot waive this Court's independent review.

Facility for first-degree murder of his infant daughter. Montour killed Sergeant Eric Autobee on October 18, 2002, by striking him on the back of his head with an industrial-sized ladle, and was subsequently arrested and charged with first-degree murder and possession of contraband. The district court granted Montour's request to proceed pro se and appointed advisory counsel.

The prosecution formally notified Montour that it would seek the death penalty and gave Montour notice of the statutory aggravating factors it sought to prove. The prosecution alleged six aggravating factors enumerated in subsection 18–1.3–1201(5):(1) Montour committed the class 1 felony of first-degree murder while he was imprisoned for another class 1 felony (first-degree murder); (2) Montour was previously convicted of a class 1 felony involving violence (first-degree murder); (3) Montour intentionally killed a peace officer engaged in the course of performing his official duties with the knowledge that Autobee was a peace officer; (4) Montour committed the first-degree murder while lying in wait; (5) Montour committed the first-degree murder in an especially heinous, cruel or depraved manner;[3] and (6) Montour's possession of the weapon he used to commit the first-degree murder constituted a felony offense.

Montour filed a motion in which he asked the district court to declare Colorado's death penalty statute unconstitutional under *Ring*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, which the district court denied. Montour then filed a petition to enter a guilty plea to the first-degree murder charge.

Prior to entering his guilty plea, Montour repeatedly stated that he understood that by pleading guilty he was waiving his right to have a jury determine his sentence under subsection 18–1.3–1201(1)(a). In every instance in which he waived his right to jury sentencing, his waiver was linked to his guilty plea; all the parties—Montour, the district attorney, and the district court—understood that Montour was required to waive this right because he was pleading guilty. Montour's statements indicate that he understood this linkage. His pro se petition to enter a guilty plea includes statements indicating this understanding,[4] as do his statements at the motions hearing acknowledging the court's advisement of the conditions of his guilty plea, and the guilty plea advisement he signed.[5] The district court repeatedly explained to Montour at the motions hearing on Montour's guilty plea that the consequences of pleading guilty under subsection 1201(1)(a) included a required waiver of his right to jury sentencing,[6] and the

---

3. This aggravating factor was withdrawn by the prosecution prior to the sentencing hearing.

4. In Montour's petition to enter a guilty plea, he stated that *"by entering a plea of guilty* as charged, the factual determination of guilt or innocence is moot and *sentencing determinations are then made by the Judge."* He also stated, "I am fully aware that *due to my guilty plea, I waive* three important trial rights [including] *a jury determination of the sentencing according to C.R.S. 18–1.3–1201(1)(a)."* (emphasis added).

5. The guilty plea advisement form contained the following statements:

I understand that *if I waive my rights to sentencing by a jury of twelve persons by the act of entering a plea of "GUILTY" to Murder in the First Degree, that the judge accepting my plea of "GUILTY" to Murder in the First Degree ... will determine the sentence* to be imposed after conducting a sentencing hearing as provided by law.... I understand, AND THE COURT HAS SPECIFICALLY INSTRUCTED ME AS REQUIRED BY C.R.S. 18–1.3–1201(1)(a), that *if I enter a "GUILTY" plea to Murder in the*

*First Degree,* a CLASS ONE FELONY, *I will waive each and all of my constitutional and statutory rights* to a jury trial and *will also be waiving* each and all of my constitutional and statutory rights *to a jury determination of the sentence that I will receive following a sentencing hearing.* ... I further expressly state that *by pleading "GUILTY" to Murder in the First Degree* I want the Honorable Paul A. King, Judge, or if unavailable a replacement judge, *to determine the sentence to be imposed on me* .... I understand that *following my "GUILTY" plea to COUNT ONE, MURDER IN THE FIRST DEGREE, the judge accepting my plea ... shall conduct a separate sentencing hearing* to determine if I should be sentenced to life in prison without the possibility of parole or death. Not only do I understand this, but I expressly do not object to sentencing occurring in this fashion.
(emphasis added).

6. The district court made the following statements:

*[B]y entering a plea of guilty, ... you will also be waiving each and every one of your constitu-*

People tendered the guilty plea advisement form Montour signed, which included statements indicating that Montour understood that he was waiving his right to jury fact-finding during sentencing because he was pleading guilty.

The district court accepted Montour's guilty plea and held a three-day sentencing hearing. At the hearing, Montour renewed his motion challenging the Colorado death penalty statute's constitutionality under *Ring*. The district court denied Montour's motion without comment. Montour did not call any witnesses, offer any exhibits, or proffer any evidence in mitigation except his cooperation with law enforcement.

At the sentencing hearing, the district court found that when Montour entered his guilty plea, he was "thoroughly and repeatedly advised that by pleading guilty, the sentencing determination in this matter would be made by this Court" and "agreed to this process." Hence, the district court conducted the death penalty eligibility determination and found that the prosecution proved all five of the statutory aggravating factors beyond a reasonable doubt. Regarding mitigating evidence, the district court found that the mitigating fact that Montour cooperated with law enforcement by confessing his crime had to be considered "in light of the savagery of his unprovoked attack on a peace officer." The court found that "his reasons for cooperating with law enforcement were not to provide assistance to the investigation, but instead, to broadcast his own distorted logic behind this cold-blooded murder."

The court then weighed the aggravating factors against the mitigating factors and concluded that the mitigating factors did not outweigh the aggravating factors, reasoning that "[w]hatever weight can be given to mitigation that can be associated with the defendant's willingness to talk to law enforcement pales in comparison to the aggravating factors established in this case." The district court then proceeded to the selection of a sentence and chose the death penalty, considering the circumstances surrounding the crime, Montour's character, background, and history, and the impact on the victim's family.

We now independently review Montour's death sentence, analyzing the constitutionality of subsection 18–1.3–1201(1)(a).

## IV. Analysis

### Right to Jury Trial on Sentencing Facts

■ The Sixth and Fourteenth Amendments to the United States Constitution require that any fact that increases the penalty for a crime beyond the statutory maximum, except the fact of a prior conviction, must be submitted to a jury and proven beyond a reasonable doubt. *Apprendi*, 530 U.S. at 476, 490, 120 S.Ct. 2348. The facts that fall under the *Apprendi* right to jury fact-finding include all "facts essential to punishment." *Cunningham v. California*, —— U.S. ——, ——, 127 S.Ct. 856, 869, 166 L.Ed.2d 856

*tional and statutory rights to a jury determination of the sentence that will be imposed in this case.... Now, as simply as I can put it, by entering a plea today, you eliminate the possibility of a jury deciding what sentence will be imposed.... [B]y pleading guilty today, Mr. Montour, the sentencing, then, will devolve to this Court and that it will be my decision to make. And the sentencing that I have to impose will be a decision between life imprisonment without parole or death. But that decision will be made by me alone. And that's what you're agreeing to by entering a plea today.... [T]he Court will have to determine beyond a reasonable doubt whether mitigation is insufficient to outweigh aggravation. That would be a decision that the jury would make if you were to persist in your plea of not guilty or persist in your ... request to have the jury resolve the matter. But by entering a plea, the*

*jury will not make that decision, in fact, the Court will.... [B]y entering a plea of guilty, you are, once again, agreeing that a jury will not consider those aggravating factors, but instead, this Court will consider those aggravating factors to determine if, in fact, the People have established one or more of those aggravating factors beyond a reasonable doubt.... [W]hat this all boils down to is that the sentencing phase of this matter, if the Court accepts your pleas today, completely is my burden, is my responsibility. The sentencing means for Count one, the charge of Murder in the First Degree, this Court must determine whether life in prison without parole is imposed or death is imposed. That would be my decision to make. And by entering a plea, you are agreeing that I do that in this case.*
(emphasis added).

(2007). *See also Blakely,* 542 U.S. at 304, 124 S.Ct. 2531 (noting that the jury must find "all the facts which the law makes essential to the punishment" (internal quotation omitted)); *People v. Isaacks,* 133 P.3d 1190, 1192–93 (Colo.2006) (citing *Blakely,* 542 U.S. at 304, 124 S.Ct. 2531).

We have labeled the fact of a prior conviction as "*Blakely*-exempt" because it need not be found by a jury. *Lopez,* 113 P.3d at 723. In *Lopez,* we held that under subsection 18–1.3–401(6), C.R.S. (2006),[7] the existence of any *Blakely*-exempt fact opens the aggravated range and permits the sentencing court to determine other aggravating facts that are not *Blakely*-exempt. *Lopez,* 113 P.3d at 731; *DeHerrera v. People,* 122 P.3d 992, 994 (Colo. 2005).

The *Apprendi* rule applies in death penalty cases, such that defendants facing the death penalty have a Sixth Amendment right to a jury trial on facts necessary for imposition of the death penalty. *Ring,* 536 U.S. at 609, 122 S.Ct. 2428. In the death penalty context, the facts essential to the punishment that fall under the *Apprendi–Ring–Blakely* rule consist of those facts needed to make a death penalty eligibility determination. *See Woldt,* 64 P.3d at 266–67 (reasoning that the Sixth Amendment requires that a jury find any facts necessary to make a defendant eligible for the death penalty).

The Colorado death penalty sentencing scheme includes four steps: finding aggravating factors, finding mitigating factors, weighing aggravating factors against mitigating factors, and determining whether the death penalty is the appropriate sentence for a particular defendant. § 18–1.3–1201(2)(a); *Woldt,* 64 P.3d at 264 (referencing section 16–11–103, which was repealed and recodified in 2002 at section 18–1.3–1201). The first three steps constitute the death penalty eligibility determination. § 18–1.3–1201(2)(a)(I)–(II); *Woldt,* 64 P.3d at 264 (citing *Dunlap,*

975 P.2d at 739). By the terms of subsection 18–1.3–1201(2)(a), a jury determines death penalty eligibility and completes the fourth step of selecting a sentence. Hence, the statutory right to jury sentencing in Colorado is even greater than the Sixth Amendment right under the *Apprendi–Ring–Blakely* line of cases because it encompasses not only a jury trial on sentencing facts, but also includes the right to have a jury impose a sentence of life or death after determining that the defendant is eligible for the death penalty.

■ The People argue that subsection 18–1.3–1201(1)(a) is constitutional as applied to Montour because his death sentence is properly based on the "*Blakely*-exempt" fact of a prior conviction, citing to our reasoning in *Lopez,* 113 P.3d at 723. Hence, the People argue, Montour has no right to jury fact-finding regarding the other aggravating factors on which the district court based his death sentence because he was eligible for the death penalty based solely on the fact of his prior conviction. We disagree, as our holding in *Lopez* was based on the language in subsection 18–1.3–401(6), which is fundamentally different from the death penalty eligibility determination under subsection 18–1.3–1201(2)(a).

■ Under subsection 18–1.3–401(6), the sentencing scheme for determining aggravated prison sentences at issue in *Lopez,* a sentencing court must undertake only one step to make a defendant eligible for a prison term longer than the presumptive range: the court must find an extraordinary aggravating circumstance to justify the longer sentence. In *Lopez,* we held that the *Blakely*-exempt fact of a prior conviction may constitute the extraordinary aggravating circumstance that opens up the aggravated range. 113 P.3d at 731. In death penalty sentencing under subsection 18–1.3–1201(2)(a), on the other hand,

---

**7.** The relevant portion of subsection 18–1.3–401(6) provides:

> In imposing a sentence to incarceration, the court shall impose a definite sentence which is within the presumptive ranges set forth in subsection (1) of this section unless it concludes that extraordinary mitigating or aggravating circumstances are present, are based on evidence in the record of the sentencing hearing and the presentence report, and support a different sentence which better serves the purposes of this code with respect to sentencing.... If the court finds such extraordinary mitigating or aggravating circumstances, it may impose a sentence which is lesser or greater than the presumptive range;....

a sentencing court must undertake a three-step eligibility determination before finding a defendant eligible for the death penalty: finding aggravating circumstances, finding mitigating circumstances, and weighing aggravating circumstances against mitigating circumstances. Because a defendant is not eligible for the death penalty until all aggravating factors are weighed against all mitigating factors, the presence of one *Blakely*-exempt aggravating factor standing alone does not make a capital defendant eligible for the death penalty.

■ Hence, our *Lopez* holding does not apply in the death penalty sentencing context. Capital defendants have a right to a jury trial on all aggravating facts used to determine death eligibility. *See* § 18–1.3–1201(2)(a)(I)–(II); *Woldt*, 64 P.3d at 266–67. Montour has a Sixth Amendment right to jury fact-finding on the aggravating factors other than the fact of his prior conviction that are essential to the death eligibility determination. We now turn to the question of whether Montour waived this right.

## Waiver of Right to Jury Trial on Sentencing Facts

The General Assembly amended subsection 18–1.3–1201(1)(a) in 2002 at an extraordinary session that the governor called in response to *Ring*. Governor of Colorado, Executive Order No. D–020–02, Call for the Third Extraordinary Session of the Sixty-Third General Assembly. At that time, it was unclear whether the right to have a jury trial on all facts essential to punishment during sentencing was independent of the Sixth Amendment right to have a jury trial on the guilt phase. *See Blakely*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. Over two years passed before the United States Supreme Court squarely addressed this issue in *Blakely*. *Id.*

*Blakely* established the right to a jury trial during sentencing on all facts essential to punishment as a right independent from the right to a jury trial on the issue of guilt. *Id.* at 301–05, 124 S.Ct. 2531. In a factual situation similar to this case—the defendant pled guilty—the United States Supreme Court held that the trial court's finding of aggravating facts and imposition of an aggravated sentence after the defendant pled guilty violated the defendant's Sixth Amendment right to trial by jury. *Id.* The Court stated that "[w]hen a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding." *Id.* at 310, 124 S.Ct. 2531.

Since *Blakely*, this Court has also recognized the Sixth Amendment right to jury trial on sentencing facts as independent of the Sixth Amendment right to a jury trial on guilt. In *Lopez*, we held that defendants who plead guilty retain a right to a jury trial on any fact, other than a *Blakely*-exempt fact, which is necessary to support a sentence that exceeds the maximum authorized by the facts established by the guilty plea. 113 P.3d at 723.

Likewise, in *Isaacks* we acknowledged that United States Supreme Court precedent clearly establishes that a defendant has an independent right to jury sentencing when the intended sentence involves factual findings beyond those established by the plea:

> *Apprendi* and *Blakely* provide a clear answer to the question of what facts are covered by the jury-trial right: The *Blakely* right extends to all facts that are not reflected in a jury verdict or, in the case of a plea bargain, to all facts beyond those that establish the elements of the charged offense.

133 P.3d at 1193.

■ Even though the General Assembly did not anticipate the *Blakely* holding when it amended subsection 18–1.3–1201(1)(a) in response to *Ring*, it did recognize the significance of the independent right to a jury trial on sentencing facts. The subsection provides in pertinent part that "[t]he court shall instruct the defendant … when pleading guilty, that he or she *is also* waiving his or her right to a jury determination of the sentence at the sentencing hearing." § 18–1.3–1201(1)(a) (emphasis added). It is well-established that a guilty plea serves as a defendant's waiver of his right to a jury trial on guilt. *Boykin v. Alabama*, 395 U.S. 238,

242–43, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *People v. Kyler*, 991 P.2d 810, 816 (Colo. 1999). By including the language acknowledging that a defendant "is also" waiving his right to jury sentencing when he pleads guilty, the General Assembly emphasized the importance of a defendant's right to a jury trial on sentencing facts.

■ A defendant may waive his right under *Apprendi* to have a jury determine facts during sentencing. *Blakely*, 542 U.S. at 310, 124 S.Ct. 2531; *Lopez*, 113 P.3d at 726. The general standard for the waiver of a constitutional right is an intentional relinquishment of a known right or privilege. *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984). This standard applies to the waiver of jury sentencing on facts that form the basis of an aggravated sentence. *Isaacks*, 133 P.3d at 1194 (stating "it is not difficult to extrapolate the rule that, like the right to jury trial generally, the right to have a jury determine the facts that form the basis for aggravated sentencing ... is a fundamental right that can only be waived knowingly, voluntarily, and intelligently"). Because defendants have a Sixth Amendment right to jury sentencing in capital cases, the main issue before us is whether subsection 18–1.3–1201(1)(a) procures the necessary waiver of this right.

■ The guilty plea alone does not constitute a waiver of the right to jury fact-finding on death eligibility. *Cunningham*, 127 S.Ct. at 865 (recognizing *Blakely's* rejection of the State's argument that the *Apprendi* rule did not apply because the guilty plea in *Blakely* provided the court with discretion to impose an exceptional sentence); *Blakely*, 542 U.S. at 304, 124 S.Ct. 2531 (defendant pled guilty

but still had a right to jury fact-finding during sentencing); *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (same); *Lopez*, 113 P.3d at 726–27 ("A guilty plea waives the right to a jury trial on the issue of guilt but is not a stipulation to judicial sentencing based on facts not admitted in the plea.").

The People argue that this Court should follow other state courts that have held that a defendant who pleads guilty forfeits his right to jury fact-finding during sentencing, citing *Leone v. State*, 797 N.E.2d 743 (Ind. 2003); *People v. Altom*, 338 Ill.App.3d 355, 272 Ill.Dec. 751, 788 N.E.2d 55 (2003); *Colwell v. State*, 118 Nev. 807, 59 P.3d 463 (2002); *State v. Crisp*, 362 S.C. 412, 608 S.E.2d 429 (2005); and *State v. Downs*, 361 S.C. 141, 604 S.E.2d 377 (2004). We are not persuaded as the majority of these cases are distinguishable because they were decided before *Blakely* and thus fail to recognize an independent right to jury fact-finding during sentencing. The Supreme Court of South Carolina is the only court to hold post-*Blakely* that a defendant waives his right to jury fact-finding during sentencing by pleading guilty, but its failure to cite *Blakely* suggests those decisions to be in error.

■ Once a capital defendant enters a guilty plea, he retains the Sixth Amendment right to jury sentencing on the facts essential to the determination of death eligibility.[8] A court must procure the appropriate waiver after a guilty plea or finding of guilt before judicial fact-finding in sentencing is permissible. *See Blakely*, 542 U.S. at 310, 124 S.Ct. 2531.

We now turn to subsection 18–1.3–1201(1)(a) to determine whether its waiver provision is constitutional.

---

**8.** We note that *People v. Lopez*, 148 P.3d 121 (Colo.2006), does not affect our conclusion. In *Lopez*, this Court held that a jury cannot be impanelled after a guilty plea to find *Blakely*-compliant facts, capable of justifying a sentence in the aggravated range. *Id.* at 124–25. The Court reasoned that allowing consideration of subsequent jury findings would violate the defendant's right to understand all of the elements of the crime to which he pleads and the effects of his plea as required by Rule 11 of the Colorado Rules of Criminal Procedure.

Capital cases differ from other criminal cases in that the defendant has notice that the prosecu-

tion intends to seek the death penalty no later than sixty days after· arraignment and must be provided with the information that may be introduced at the sentencing hearing, including a list of all aggravating factors and mitigating factors, not later than twenty days after the prosecution files its written intention to seek the death penalty. § 18–1.3–1201(3)(a)–(3)(b)(VI); Colo.Crim. P. 32.1(b). At the time of the guilty plea the defendant is fully aware that the prosecution will attempt to prove aggravating factors at a subsequent sentencing hearing that will be held following the guilty plea. § 18–1.3–1201; Colo. Crim. P. 32.1(c).

### Constitutionality of Section 18–1.3–1201

 A statute is facially unconstitutional only if no conceivable set of circumstances exist under which it may be applied in a constitutionally permissible manner. *Woldt,* 64 P.3d at 266. Out of respect to the legislative and executive branches, we begin with the presumption that a statute is constitutional. *Id.* Ultimately, however, we make the decision as to the statute's constitutionality. *Id.*

 Subsection 18–1.3–1201(1)(a) contains the statutory language at issue here. This provision mandates that when a defendant pleads guilty to a class 1 felony, he must waive his right to a jury trial on sentencing facts and the trial court must conduct the sentencing hearing:

> Upon conviction of guilt of a defendant of a class 1 felony, the trial court shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment.... *If a trial jury was waived or if the defendant pled guilty, the hearing shall be conducted before the trial judge. The court shall instruct the defendant when waiving his or her right to a jury trial or when pleading guilty, that he or she is also waiving his or her right to a jury determination of the sentence at the sentencing hearing.*

§ 18–1.3–1201(1)(a) (emphasis added).

This provision links the waiver of a defendant's right to jury trial on sentencing facts to the guilty plea because, if a defendant pleads guilty, then his right to a jury trial on sentencing is automatically waived. The statutory language is mandatory, "if the defendant pled guilty, the hearing *shall* be conducted before the trial judge." *Id.* (emphasis added). The statute further states that the court shall instruct the defendant that when he is pleading guilty that he "is also" waiving his right to a jury determination at sentencing. *Id.* According to this provision, the court need not procure an individual waiver of the defendant's right to a jury trial on sentencing facts. The guilty plea necessarily results in this waiver by terms of the statute.

 The defendant's entry of a guilty plea does not waive a defendant's independent right to a jury trial on all facts essential to punishment during sentencing. *Cunningham,* 127 S.Ct. at 865; *Blakely,* 542 U.S. at 304, 124 S.Ct. 2531; *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348; *Lopez,* 113 P.3d at 726–27. As previously discussed, the Sixth Amendment requires the district court either to afford a capital defendant a jury trial on aggravating factors or to procure an additional knowing, voluntary, and intelligent waiver of this independent right after a defendant enters a plea of guilt. *Blakely,* 542 U.S. at 304, 310, 124 S.Ct. 2531; *Isaacks,* 133 P.3d at 1194. Subsection 18–1.3–1201(1)(a) violates the Sixth Amendment because it mandates that a court sentence a capital defendant who has pled guilty to a class 1 felony. Under the terms of the statute, the court need not procure an additional knowing, voluntary, and intelligent waiver of this Sixth Amendment right as is constitutionally required, but instead must inform the defendant that by pleading guilty he automatically waives his right to a jury trial on sentencing facts.

 It is true that when a defendant pleads guilty he necessarily waives other rights including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers. *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). A defendant's guilty plea does not, however, waive all of his rights. Instead, as argued by Amicus Colorado Criminal Defense Bar, this guilty plea only waives those rights that are incompatible with a guilty plea. For example, while a defendant cannot plead guilty and retain his Sixth Amendment right to a jury trial on the guilt phase, he does retain the right to counsel until the case is concluded.

The defendant's right to a jury trial on sentencing facts is not incompatible with pleading guilty. While it would be impossible for a defendant to testify in a case where he has entered a guilty plea, a defendant can plead guilty and still have jury trial on sentencing facts. Because the entry of a guilty plea does not necessarily require a waiver of

the right to a jury trial on sentencing facts, it is improper for the statute to require that the defendant's guilty plea automatically waive this right.

This linkage is especially problematic because it compromises the defendant's exercise of his Sixth Amendment right to jury sentencing on the facts essential to the determination of death penalty eligibility by conditioning the defendant's access to a guilty plea upon his waiver of this right. Defendants in capital cases have a powerful incentive to plead guilty due to the serious consideration given to mitigating evidence of remorse and acceptance of responsibility in capital sentencing. *See Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (recognizing that it is unconstitutional to preclude jurors' consideration of mitigating evidence because the consideration of mitigating evidence is key to individualized sentencing in capital cases); *State v. Louviere,* 833 So.2d 885, 894 (La.2002) (recognizing that "denying a defendant the choice to plead guilty arguably would impermissibly deprive the defendant, per the federal Constitution, of his strategic choice to acknowledge his crime and thereby appear remorseful before his jury"); Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty,* 83 Cornell L.Rev. 1557, 1558, 1586 (1998) (noting that a defendant's lack of remorse is often a significant factor precipitating the jury's decision to impose the death penalty). Further, because trials of capital cases can be especially traumatic, some defendants are compelled to enter guilty pleas so as to avoid the pain that the process inevitably will cause to themselves, their families, or the victim's families. *See Brady v. United States,* 397 U.S. 742, 750, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (explaining that "post-indictment accumulation of evidence may convince the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family" and that guilty pleas entered for this reason are valid); *see generally Abney v.*

*United States,* 431 U.S. 651, 661–62, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (recognizing "the personal strain, public embarrassment, and expense of a criminal trial"); Barry J. Fisher, *Judicial Suicide or Constitutional Autonomy? A Capital Defendant's Right to Plead Guilty,* 65 Alb. L.Rev. 181, 200–01 (2001) (recognizing the capital defendant's interest in avoiding trial by entering a guilty plea). By linking the waiver of a jury trial on sentencing facts to the guilty plea, this statute unnecessarily increases the likelihood that a defendant will waive his Sixth Amendment right to a jury trial on facts essential to the death penalty eligibility determination in order to plead guilty on the merits, thereby compromising one of his Sixth Amendment rights.

Because the statute does not require the court to procure a knowing, voluntary, and intelligent waiver of a defendant's independent right to a jury trial on the facts essential to the determination of death eligibility (here, the first three steps of death penalty sentencing in subsection 18–1.3–1201(2)(a)), we hold that this linked automatic waiver violates a defendant's Sixth Amendment right to jury sentencing. We conclude that no conceivable set of circumstances exist under which it may be applied in a constitutionally permissible manner.[9] *See Woldt,* 64 P.3d at 266. The facts of this case prove this point. The People argue that Montour waived a sentencing jury and consented to judicial fact-finding. While it is true that the record is awash with advisements by the district court and statements of waiver by Montour, we disagree that these waivers were sufficient because they were linked to the statute's command that Montour's guilty plea automatically forfeited his right to a jury trial on his sentence.

We find as a matter of law that Montour's waiver could not have been knowing, voluntary, and intelligent because it was infected by the same constitutional infirmity as subsection 18–1.3–1201(1)(a)—his waiver was inextricably linked to his guilty plea. Our

9. We note that the General Assembly was not aware of the possible constitutional infirmity of the statute at the time the legislature added this language. Both sentences were added prior to the United States Supreme Court's decision in

*Blakely,* such that it was not clear that the right to a jury trial on sentencing facts is independent of the right to a jury trial on guilt. Hence, the General Assembly focused little attention on the constitutionality of the waiver provision.

review of the record indicates that while Montour knew he was waiving his right to a jury trial on sentencing facts, each time the court procured this waiver it was with the understanding by all parties that Montour waived it *by pleading guilty* under the statute which automatically waived his right to jury sentencing.[10]

We hold that subsection 18–1.3–1201(1)(a)'s linked waiver violates a defendant's Sixth Amendment right to jury sentencing on the facts essential to the determination of death penalty eligibility. Under no circumstances could this statute be applied to procure a constitutional waiver. Montour did not knowingly, intelligently, and voluntarily waive his Sixth Amendment right to a jury trial on the facts that were essential to his death penalty eligibility determination.

The Sixth Amendment violation in subsection 18–1.3–1201(1)(a) renders Montour's death sentence invalid. For this reason, we reverse Montour's death sentence. We now must address the appropriate remedy on remand in this case. The issue is whether we should direct the district court to sentence Montour to life imprisonment, or direct the district court to provide a new jury sentencing hearing to determine his eligibility for a death sentence and to determine whether he should receive a death sentence or life imprisonment.

### Remedy

Turning to our death penalty statute, we excise the unconstitutional language in that statute pursuant to its severability clause. After doing this, we are left with a coherent statutory scheme which provides that if the death sentence of a defendant who pled guilty is invalid under the circumstances of this case, then the case shall be remanded to the district court for a new sentencing hearing before a newly impaneled jury unless the defendant waives this right to jury sentencing. Where there is a coherent death penalty sentencing scheme after severing unconstitutional portions of the statute, life imprisonment becomes the required sentence only if the death penalty itself is held unconstitutional, or if the evidence is insufficient to support the death sentence. Neither of these circumstances is the case here.

The death penalty statute includes a severability clause which states that unconstitutional provisions are to be severed and the remaining statute is to remain operative where possible.[11] As our authority extends to determine whether the severance of unconstitutional portions of a statute is viable, *Bd. of County Comm'rs v. Vail Assocs., Inc.,*

---

10. The court repeatedly instructed Montour that his guilty plea would result in his waiver of a jury trial on sentencing facts. Likewise, Montour repeatedly acknowledged that he understood that he was waiving his right to a jury trial on sentencing facts by pleading guilty.

Montour's linked waiver appears in the three sources documenting his guilty plea. First, in his petition to enter a guilty plea, Montour made several statements indicating his awareness of the linked nature of the plea: "I am fully aware that *due to my guilty plea,* I waive three important trial rights [including] a jury determination of the sentencing according to C.R.S. 18–1.3–1201(1)(a)." (emphasis added). Second, the court's instruction to Montour during the motions hearing on his guilty plea continually emphasized the linked nature of the plea: *"by entering a plea today,* you eliminate the possibility of a jury deciding what sentence will be imposed." (emphasis added). Finally, in his guilty plea advisement form, Montour again acknowledged his understanding that by pleading guilty he waived his right to jury sentencing: "I understand that if I waive my rights to sentencing by a jury of twelve persons *by the act of entering a plea*

of *"GUILTY"* to Murder in the First Degree, that the judge accepting my plea ... will determine the sentence to be imposed after conducting a sentencing hearing as provided by law ...." (emphasis added). These statements are representative of others indicating that Montour never made a knowing, intelligent, and voluntary waiver of his right to a jury trial on sentencing facts that was independent of his guilty plea.

11. The death penalty statute's severability clause states:

If any provisions of this section are determined by the United States supreme court or by the Colorado supreme court to render this section unconstitutional or invalid such that this section does not constitute a valid and operative death penalty statute for class 1 felonies, but severance of such provisions would, through operation of the remaining provisions of this section, maintain this section as a valid and operative death penalty statute for class 1 felonies, it is the intent of the general assembly that those remaining provisions are severable and are to have full force and effect.

§ 18–1.3–1201(7)(a).

19 P.3d 1263, 1280 (Colo.2001), we apply traditional principles of severability to determine whether excising the unconstitutional provisions in section 18–1.3–1201 leaves us with a valid and operative death penalty statute.

When a statute is unconstitutional, the proper remedy is determined by looking to legislative intent. *United States v. Booker,* 543 U.S. 220, 246, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *City of Lakewood v. Colfax Unlimited Ass'n, Inc.,* 634 P.2d 52, 70 (Colo.1981). We seek to determine what the General Assembly would have intended in light of our constitutional holding. *Booker,* 543 U.S. at 246, 125 S.Ct. 738. *See also People ex rel. Tooley v. Seven Thirty–Five East Colfax, Inc.,* 697 P.2d 348, 372 (Colo. 1985) (looking to what the legislature would have intended if it knew the court would hold part of a statute to be unconstitutional). A severability clause creates the presumption that the General Assembly would have been satisfied with the portions of a statute that remain after the unconstitutional portions are stricken. *Colfax Unlimited Ass'n,* 634 P.2d at 70. This presumption governs unless the remaining statutory language is so riddled with omissions that it cannot be salvaged as a meaningful legislative enactment. *Id.* We are not required to strike an entire sentence or separate section or subsection as unconstitutional; words or phrases may be severed. *Rodriguez v. Schutt,* 914 P.2d 921, 929 (Colo.1996).

We now consider which portions of section 18–1.3–1201 are unconstitutional such that they must be stricken. As discussed, requiring a waiver of the right to a jury trial on all facts essential to the death penalty eligibility determination when a defendant pleads guilty violates a capital defendant's rights under the Sixth Amendment. Hence, any language linking this waiver to a guilty plea on the guilt phase of the case must be stricken. Such language occurs in two parts of this statute: subsection 1201(1)(a), which provides the sentencing procedure the district court must follow when a defendant is convicted of a class 1 felony, and subsection 1201(7)(b), which controls the procedure for the district court to follow on remand when

we hold a defendant's death sentence invalid and remand for resentencing. While striking the language in subsection 1201(1)(a) has no bearing on what we direct the district court to do on remand in Montour's case, striking the language in subsection 1201(7)(b) controls what must happen on remand in this case.

### Sentencing Procedures for Convicted Class 1 Felons: Subsection 1201(1)(a)

The following underlined portions of the provision for sentencing class 1 felons (subsection 1201(1)(a)) which link the waiver of the right to jury sentencing to the guilty plea, must be stricken as unconstitutional:

Upon conviction of guilt of a defendant of a class 1 felony, the trial court shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment, unless the defendant was under the age of eighteen years at the time of the commission of the offense or unless the defendant has been determined to be a mentally retarded defendant pursuant to part 11 of this article, in either of which cases, the defendant shall be sentenced to life imprisonment. The hearing shall be conducted by the trial judge before the trial jury as soon as is practicable. Alternate jurors shall not be excused from the case prior to submission of the issue of guilt to the trial jury and shall remain separately sequestered until a verdict is entered by the trial jury. If the verdict of the trial jury is that the defendant is guilty of a class 1 felony, the alternate jurors shall sit as alternate jurors on the issue of punishment. If, for any reason satisfactory to the court, any member or members of the trial jury are excused from participation in the sentencing hearing, the trial judge shall replace each juror or jurors with an alternate juror or jurors. <u>If a trial jury was waived or if the defendant pled guilty, the hearing shall be conducted before the trial judge. The court shall instruct the defendant when waiving his or her right to a jury trial or when pleading guilty, that he or she is also waiving his or her right to a jury determi-</u>

nation of the sentence at the sentencing hearing.

§ 18–1.3–1201(1)(a). Although subsection 1201(1)(a) does not control the remedy in this case, we must determine whether severing the underlined language leaves us with a coherent sentencing scheme that trial courts may apply in future cases, or whether the entire provision must be stricken because the remaining language is not salvageable. *See Colfax Unlimited Ass'n*, 634 P.2d at 70. To make this determination, we look to the intent of the General Assembly. *Booker*, 543 U.S. at 246, 125 S.Ct. 738; *Colfax Unlimited Ass'n*, 634 P.2d at 70.

The proper question to ask is what the General Assembly would have intended in light of our constitutional holding striking the waiver provision in the last two sentences of the subsection. *See Booker*, 543 U.S. at 246–47, 125 S.Ct. 738; *Seven Thirty–Five East Colfax*, 697 P.2d at 372. As explained in *Booker*, this legislative intent dictates the proper remedial approach. 543 U.S. at 246, 125 S.Ct. 738 (recognizing that when a court considers remedies that alter the system that Congress designed, it must determine the remedy that deviates least radically from Congress' intended system). In *Booker*, the majority concluded that severance of the unconstitutional provision of the federal sentencing statute was the proper remedial approach, because it was the remedy Congress would have preferred. *Id.* at 249, 125 S.Ct. 738. To reach this conclusion the Court rejected the dissent's alternative remedial approach, employing a broader interpretation of the statutory language such that it comported with the Sixth Amendment jury trial requirement and avoided constitutional infirmity. *Id.* at 250, 125 S.Ct. 738. The Court concluded that the dissent's remedial approach was inappropriate as applied to the sentencing statute because it led to a result inconsistent with Congressional intent. *Id.* ("[the dissent's] reinterpretation ... would be plainly contrary to the intent of Congress") (internal quotation omitted). It did not, however, reject this remedial approach of constitutional avoidance in all cases. Hence, we now assess the General Assembly's intent when amending subsection 18–1.3–1201(1)(a) to determine the appropriate remedial approach in this case.

As stated, the General Assembly amended subsection 18–1.3–1201(1)(a) in 2002 at an extraordinary session that the governor called in response to *Ring*. The General Assembly's primary intent in amending the death penalty statute was to ensure that Colorado has a constitutional death penalty statute. To achieve this result, the legislature intended to amend the statute to comport with *Ring's* jury trial requirement. This intent appears in the plain language of the severability clause, which states the purpose of the severability clause is to "maintain this section as a valid and operative death penalty statute." § 18–1.3–1201(7)(a).[12]

Our review indicates that there are two possible interpretations of subsection 1201(1)(a) after the unconstitutional language is severed: a narrow reading and a broad one. We resolve the question of which interpretation to follow based on the fundamental intent of the General Assembly to maintain a constitutional, valid, and operative death penalty statute, and the doctrine of constitutional avoidance, under which courts have a duty to interpret a statute in a constitutional manner where the statute is susceptible to a constitu-

---

**12.** Although the legislative intent could not be more free from doubt since the General Assembly stated its intent in the text of the severability clause in subsection 1201(7)(a), we also note that its intent to maintain a valid and operative death penalty statute is abundantly clear from the legislative history of the 2002 amendments to section 18–1.3–1201. Bob Grant, the District Attorney for the Seventeenth Judicial District and a participant in drafting the bill, stated:

This severability language has to do with making sure that as best we possibly can, this legislature says to the people of this state that it recognizes that the legislature and the people want to have a constitutional, viable, and available capital punishment scheme from the date of July 1, 1995, forward, and that forward goes on into the future. What we're doing here basically is saying, look, if in fact something is declared unconstitutional in this statute, and you can sever it out so that the remainder of the statute in fact embodies a constitutionally acceptable and viable death penalty scheme, then you should do that.

Hearing on H.B. 02S–1005 Before the S. Judiciary Comm., 63rd Gen. Assem., Third Extraordinary Sess. (July 10, 2002) (statement of Bob Grant, District Attorney's Council).

tional construction. *Jones v. United States,* 526 U.S. 227, 239, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *People v. Powell,* 716 P.2d 1096, 1101–02 (Colo.1986) (citing *People v. Washburn,* 197 Colo. 419, 593 P.2d 962 (1979)). In this case, both legislative intent and the doctrine of constitutional avoidance support a broad interpretation of subsection 1201(1)(a). Hence, we construe the statute broadly.

Under the broad interpretation of subsection 1201(1)(a), "conviction of guilt" means conviction either following a jury trial or trial to the court, or pursuant to a guilty plea, and "trial jury" means either a jury on a trial to determine a defendant's guilt or a jury on a trial to determine sentencing. The result of this interpretation is that the remaining language of subsection 1201(1)(a) provides the same death penalty sentencing mechanism whether a defendant is convicted of a class 1 felony via a guilty plea, trial to the court, or jury trial on the guilt phase. This statutory scheme is coherent because it provides for capital sentencing whether conviction was by a jury trial, trial court, or a guilty plea, and does not face the same constitutional objections as does the narrow construction. Such a broad interpretation is consistent with the intent of the General Assembly to maintain a valid and operative death penalty statute and to preserve the remainder of the statute once any unconstitutional portions are severed.

By contrast, under the narrow reading of the language in subsection 1201(1)(a), "conviction of guilt" means a conviction based only on a jury trial, and "trial jury" means only the jury that heard the trial on the guilt phase.[13] Under this narrow reading, capital sentencing hearings have to be conducted before the same "trial jury" that convicted the defendant of the class 1 felony. The

consequence of this narrow reading of subsection 1201(1)(a) is that it renders the statute incomplete. While it provides for death penalty sentencing after a jury conviction on the guilt phase, there is no death penalty sentencing procedure for defendants who pled guilty. Hence, we must look elsewhere in the sentencing statutes to determine the sentence for a defendant who has pled guilty to a class 1 felony.

To determine the appropriate sentencing procedure for defendants who cannot be sentenced under subsection 1201(1)(a), we turn to the general class 1 felony sentencing provision. *See* § 18–1.3–401(4)(a) (2006).[14] This provision mandates that when defendants convicted of class 1 felonies are not sentenced to death under the procedures set forth in subsection 18–1.3–1201, they "shall be" punished by life imprisonment. *Id.* As a result, the narrow construction of subsection 18–1.3–1201(1)(a) means that a death sentence would only be available where a defendant goes to a jury trial on the merits, is convicted of a class 1 offense, and then faces the jury sentence of life or death. Defendants who plead guilty could not be sentenced to death.

This construction of the statute creates two tracks—one leading to the possible imposition of the death penalty and the other leading directly to a life sentence. A defendant who exercises his right to a jury trial on the merits must face the possibility of death, while a defendant who enters a guilty plea could not receive the death penalty but would receive a life sentence pursuant to subsection 18–1.3–401(4)(a).

Such a two-tracked system where a defendant only faces the possibility of death when he exercises his Sixth Amendment right to a jury trial on the merits, because he is en-

---

**13.** While there is no doubt that the General Assembly intended "conviction of guilt" and "trial jury" to be interpreted narrowly when it enacted subsection 1201(1)(a) because it intended to foreclose the right to jury sentencing after a guilty plea, the proper question to ask is what the General Assembly would have intended in light of our constitutional holding that a waiver of the right to jury sentencing may not be linked to a guilty plea. *See Booker,* 543 U.S. at 246, 125 S.Ct. 738; *Seven Thirty–Five East Colfax,* 697 P.2d at 372.

**14.** Subsection 401(4)(a) provides: "A person who has been convicted of a class 1 felony *shall* be punished by life imprisonment in the department of corrections *unless* a proceeding held to determine sentence according to the procedure set forth in section 18–1.3–1201 ... results in a verdict that requires imposition of the death penalty ...." (emphasis added).

sured a life sentence if he enters a guilty plea, appears to be unconstitutional under the holding of *United States v. Jackson,* 390 U.S. 570, 581–83, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). *Accord Hynes v. Tomei,* 92 N.Y.2d 613, 684 N.Y.S.2d 177, 706 N.E.2d 1201 (1998).[15] In *Jackson,* the United States Supreme Court held that the sentencing provision of the Federal Kidnaping Act, which facially foreclosed the death penalty as a sentencing option where a defendant pled guilty, violated the defendant's Sixth Amendment rights by needlessly chilling the right to demand a jury trial on the guilt phase. 390 U.S. at 581–83, 88 S.Ct. 1209. The Court reasoned that such a sentencing scheme chills a defendant's constitutional right to a jury trial because the risk of death accompanying the exercise of this right encourages a defendant to waive it and plead guilty. *Id.* at 583, 88 S.Ct. 1209.

Thus, on its face the narrow construction of subsection 1201(1)(a) is identical to the scheme in *Jackson,* held to be unconstitutional. A defendant would only face the death penalty if he exercised his Sixth Amendment right to a jury trial.

Our conclusion is not altered by the fact that in Colorado, a capital defendant does not have the ability to plead guilty unilaterally as the district attorney and district court may reject any guilty plea to a class 1 felony. § 16–7–206(2), C.R.S. (2006). This consent provision does not cure the *Jackson* problem in the narrow interpretation of subsection 1201(1)(a) because the question under *Jackson* is not the validity of a guilty plea that arises out of the statutory scheme encouraging guilty pleas. *See North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (holding that the defendant's guilty plea to a lesser crime to avoid the death penalty was valid despite the defendant's protestations that he was compelled to enter the guilty plea to avoid the possibility of death); *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (upholding a defendant's guilty plea despite the defendant's claims that he would not

have entered the guilty plea except for his desire to avoid a possible death sentence). The question is whether the statutory scheme is facially unconstitutional because it explicitly provides two levels of penalty for the same offense such that a defendant's Sixth Amendment right to demand a jury trial is needlessly burdened. *See Jackson,* 390 U.S. at 583, 88 S.Ct. 1209 (reasoning that the fact that the trial court may reject guilty pleas does not cure the constitutional infirmity in the Federal Kidnaping Act's sentencing provision); *Hynes,* 684 N.Y.S.2d 177, 706 N.E.2d at 1206 (holding that "the need to obtain approval from the People and the court will not save plea provisions that otherwise violate *Jackson* "). The "narrow interpretation" causes the defendant to face the two-tracked system until the prosecutor decides to accept or reject the guilty plea.

Thus, if we construed this statutory language narrowly rather than broadly, serious constitutional problems would be presented. The doctrine of constitutional avoidance weighs against the narrow interpretation because the statute is also susceptible to a broader construction that does not present the same constitutional impediments.

Hence, we interpret subsection 1201(1)(a) broadly, such that "conviction of guilt" means conviction either by a jury or pursuant to a guilty plea, and "trial jury" means either a jury on a trial to determine a defendant's guilt or a jury on a trial to determine sentencing. The practical result of this interpretation is that a defendant who pleads guilty is sentenced under the same procedures as a defendant who is convicted following a jury trial.

### Remedy For an Invalid Death Sentence: Subsection 1201(7)(b)

Subsection 1201(7)(b), which governs what we do in this case, contains similar language linking the waiver of jury sentencing to pleading guilty. Subsection 1201(7)(b) provides the remedy for the invalidity of a de-

---

**15.** In *Hynes,* the court held a New York capital punishment statute that only allowed the imposition death after a jury trial unconstitutional under *Jackson,* reasoning that the statute impermis-

sibly burdened a defendant's Fifth Amendment right against self-incrimination and Sixth Amendment right to a jury trial. 684 N.Y.S.2d 177, 706 N.E.2d at 1207.

fendant's death sentence for reasons other than the unconstitutionality of the death penalty itself or insufficiency of the evidence, and is thus applicable here. This linkage provision causes the same Sixth Amendment violation as the linkage provision in subsection 1201(1)(a), except that in subsection 1201(7)(b), a defendant's guilty plea waives his right to a jury determination of sentencing facts essential to death penalty eligibility on remand after his death sentence is held invalid. In subsection 1201(7)(b), the words "pled guilty or" must be stricken because the provision including this language automatically waives a defendant's right to jury sentencing on remand if he pled guilty, thus constituting an impermissible linkage. The remainder of the phrase including the words, "waived the right to jury sentencing," can remain because sentencing before a trial judge is constitutionally permissible where the defendant waives his independent right to jury sentencing. Hence, "pled guilty or" must be stricken from subsection 1201(7)(b):

> If any death sentence is imposed upon a defendant pursuant to the provisions of this section, and on appellate review including consideration pursuant to subsection (8) of this section, the imposition of such death sentence upon such defendant is held invalid for reasons other than the unconstitutionality of the death penalty or insufficiency of the evidence to support the sentence, the case shall be remanded to the trial court to set a new sentencing hearing before a newly impaneled jury, or, if the defendant <u>pled guilty or</u> waived the right to jury sentencing, before the trial judge; . . . .

§ 18–1.3–1201(7)(b).

Severing the underlined portions leaves us with a coherent statutory scheme under which to proceed with Montour's case. Hence, we turn to subsection 1201(7)(b), which provides the remedy for the invalidity of a defendant's death sentence.

Subsection 1201(7)(b), as modified by striking the unconstitutional language, directs us to remand the case to the district court for a new sentencing hearing before a newly impaneled jury unless the defendant waives the right to jury sentencing: "the case shall be remanded to the trial court to set a new sentencing hearing before a newly impaneled jury, or, if the defendant [ ] waived the right to jury sentencing, before the trial judge."

Hence, we remand this case to the district court to provide Montour with an opportunity to have a newly impaneled jury find the facts essential to the determination of his eligibility for the death penalty. A jury must determine Montour's death penalty eligibility unless he provides a valid waiver that is not linked to his guilty plea and that is knowing, voluntary, and intelligent.

## V. Conclusion

We hold that Colorado's death penalty statute cannot unconstitutionally deprive the defendant of his Sixth Amendment jury trial right on the facts that are essential to the death penalty eligibility determination when that defendant pleads guilty. We reverse Montour's death sentence and remand this case to the district court. On remand, the district court must set a new sentencing hearing before a newly impaneled jury unless Montour waives his right to jury sentencing. To be valid, Montour's waiver of his Sixth Amendment right must be knowing, voluntary, and intelligent, and not linked to his guilty plea. Only after a valid waiver may the district court conduct the sentencing hearing.

Justice MARTINEZ concurs in part and dissents in part.

Justice COATS dissents.

Justice EID does not participate.

Justice MARTINEZ, concurring in part and dissenting in part.

Colorado's death penalty statute unnecessarily and unconstitutionally burdens a defendant's Sixth Amendment rights by linking a defendant's guilty plea to an automatic waiver of his right to a sentencing jury. There are two possible remedies available to cure the constitutional defects: sever the unconstitutional portions and be satisfied with what remains, or strike the entire statute. In order to leave a viable death penalty statute in place, the majority severs those

unconstitutional sections of the statute rather than declare the entire statute unconstitutional. However, the majority then takes the additional and unnecessary step of reinterpreting the statute in order to add a sentencing jury after a defendant pleads guilty. By creating a subsequent jury sentencing procedure, where no statutory language provides for one, the majority goes further in exercising our power to review and construe legislation than I would go.

In many respects, the remedy proposed by the majority is very attractive: it saves an otherwise unconstitutionally imposed death sentence, permits the death penalty to be reimposed in a constitutional manner, and avoids the need for the General Assembly to pass any further legislation to fix the statute. However, our severance law is designed to save unconstitutional statutes from being completely stricken when only a portion of the statute is unconstitutional, not to allow the court to alter legislation to create a new remedy.

In my view, the remaining statute is constitutional after severance and there is no need to reinterpret the statutory language. Therefore, I join in the majority's opinion holding the death penalty statute unconstitutional, but I dissent from the portion of the majority's opinion reinterpreting the statute and remanding this case for subsequent jury sentencing.

## I. The Death Penalty Statute Post–Severance

Our severance doctrines, based on both statutory law and common law, are employed solely to save the constitutional portions of a statute from complete invalidation where, after severance, the remaining statute will result in a meaningful legislative enactment. *City of Lakewood v. Colfax Unlimited Ass'n, Inc.*, 634 P.2d 52, 70–71 (Colo.1981). To avoid the danger of judicially rewriting a statute or ordinance when striking a portion of a statute, we will strike the entire legislative enactment rather than selectively sever in a way contrary to the intent expressed in the language of the statute. *See Williams v. City & County of Denver*, 198 Colo. 573, 576, 607 P.2d 981, 983 (1979). If we sever a

portion of a statute, what remains must be a valid and complete statute, applicable to resolution of the case at hand. *See Bd. of County Comm'rs v. Vail Assoc., Inc.*, 19 P.3d 1263, 1280 (Colo.2001) (applying the plain language of the remaining statute after severance of the unconstitutional portion).

Here we are able to sever the unconstitutional portions of the death penalty statute requiring judicial imposition of the death penalty, and leave a complete statute. After severance, section 18–1.3–1201(1)(a) reads:

> Upon conviction of guilt of a defendant of a class 1 felony, the trial court shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment, unless the defendant was under the age of eighteen years at the time of the commission of the offense or unless the defendant has been determined to be a mentally retarded defendant ... in either of which cases, the defendant shall be sentenced to life imprisonment. The hearing shall be conducted by the trial judge before the *trial jury* as soon as practicable. Alternate jurors shall not be excused from the case prior to submission of the issue of *guilt to the trial jury* and shall remain separately sequestered until a *verdict is entered by the trial jury. If the verdict of the trial jury is that the defendant is guilty* of a class 1 felony, the alternate jurors shall sit as alternate jurors on the issue of punishment. If, for any reason satisfactory to the court, any member or members of the *trial jury* are excused from participation in the sentencing hearing, the trial judge shall replace each juror or jurors with an alternate juror or jurors.

§ 18–1.3–1201(1)(a) (post-severance) (emphasis added).

Having severed the unconstitutional portions and leaving a "valid and operative death penalty" in place, our work is finished. § 18–1.3–1201(7)(a), C.R.S. (2006). After severance, according to the plain meaning of the death penalty statute, when a trial jury determines guilt, the trial jury imposes the sentence, which may be death. As such, the death penalty statute does not provide for a method of imposing death on a person who has pleaded guilty. Instead, when a defen-

dant pleads guilty I would first look to section 16–7–206, the guilty plea statute, for the procedures controlling guilty pleas. § 16–7–206, C.R.S. (2006).[1] I would then turn to section 18–1.3–401(4)(a), the sentencing statute for class one felonies, to determine the sentence to be imposed:

> A person who has been convicted of a class 1 felony *shall be punished by life imprisonment* in the department of corrections unless a proceeding held to determine sentence according to the procedure set forth in section 18–1.3–1201, 18–1.3–1302, or 18–1.4–102, results in a verdict that requires imposition of the death penalty, in which event such person shall be sentenced to death....

§ 18–1.3–401(4)(a), C.R.S. (2006) (emphasis added).

Under the plain language of these statutory provisions, if a defendant wishes to plead guilty to a class one felony, he or she must have the consent of the district attorney and the judge. Because the death penalty statute no longer applies once a defendant pleads guilty, the only sentence that the trial court is authorized to impose is life imprisonment. The district attorney, by consenting to a guilty plea, is therefore agreeing not to pursue the death penalty. The majority labels this plain meaning interpretation as the "narrow" interpretation and then rejects it in favor of a "broad" reinterpretation.

## II. Reinterpretation Unnecessary

An automatic and therefore involuntary waiver of jury fact-finding, permitting a judge to impose an aggravated sentence, is unconstitutional. *See Sattazahn v. Pennsylvania*, 537 U.S. 101, 111, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003) ("the Sixth Amendment requires that *a jury, and not a judge*, find the existence of any aggravating circumstances [that increases the maximum permissible sentence to death]") (emphasis added). After severing the unconstitutional language, the majority then reinterprets the statute to include a new subsequent jury sentencing procedure. It does so through a "broad" interpretation of the words "trial jury" that imposes a new meaning—trial jury now means sentencing jury. This procedure, created by the majority, provides for jury sentencing subsequent to a guilty plea to a capital crime. The majority relies primarily on two United States Supreme Court cases to support its decision to reinterpret the death penalty statute post-severance: first, the majority relies on *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), to justify its exploration of what the General Assembly "would have intended in light of our constitutional holding [here]." Maj. op. at 502. Second, the majority raises the specter of an unconstitutional chilling of the right to demand a jury trial addressed in *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). However, neither of these cases provides the majority with a valid justification for its reinterpretation of the death penalty statute.

### A. Legislative Intent

The majority relies on *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160

---

1. Section 16–7–206 reads:

 (1) Every person charged with an offense shall be permitted to tender a plea of guilty to that offense if the following conditions have been satisfied:

 (a) The court shall have advised the defendant that if the plea is accepted the defendant shall be determined to have waived his right to trial by jury on all issues including the determination of the penalty to be assessed, and the court shall also have advised the defendant as to the maximum and minimum penalties that the court may impose.

 (b) *In class 1 felonies or where the plea of guilty is to a lesser included offense, a written consent has been filed with the court by the district attorney.*

 (c) In all felony and class 1 misdemeanor cases, the defendant shall be represented by counsel or waive his right thereto in open court, and the guilty plea shall be tendered in open court by the defendant in the presence of counsel, if any.

 (2) *The refusal or consent of the district attorney or the court to accept a plea of guilty to the charge shall not be a basis for assignment of error, and such refusal or acceptance by the district attorney or court is final.*

 (3) The acceptance by the court of a plea of guilty acts as a waiver by the defendant of the right to trial by jury on all issues including the determination of the penalty to be assessed, and the acceptance of such plea also acts as a conviction for the offense.

 § 16–7–206 (emphasis added). Portions of this statute may also be unconstitutional under the majority's holding here.

L.Ed.2d 621, for the proposition that we may answer a remedial question by implementing the general legislative intent, rather than the statutory language. Maj. op. at 503. In *Booker*, Justice Breyer, writing a separate majority opinion addressing severance, concluded that a portion of the Federal Sentencing Guidelines must be severed, effectively making the guidelines advisory rather than mandatory. 543 U.S. at 246, 125 S.Ct. 738. A three justice dissent proposed an alternative remedy: requiring subsequent jury sentencing in every case where the sentence would be aggravated beyond the statutory maximum. *See id.* at 284–85, 125 S.Ct. 738 (Stevens, J., dissenting) (arguing that the Court should require that a jury be empanelled to find further facts before aggravating a sentence beyond the statutory maximum, rather than making the Guidelines advisory). Steven's approach, rejected by the Court's majority, would "engraft onto the existing system today's Sixth Amendment 'jury trial' requirement." *Id.* at 246, 125 S.Ct. 738 (Breyer, J., writing for the majority). The United States Supreme Court thereby rejected the majority's remedy here.

Breyer's majority, though clearly based on his view of what "Congress would have intended," chose not to combine his severance approach with the dissenter's "statutory construction" approach. *Id.* at 266, 125 S.Ct. 738 (rejecting the Government's proposed solution that the Guidelines be binding in some cases *and* rejecting the respondent's suggestion, adopted in Steven's dissent, that the act stand as written but a jury sentencing requirement be added). The majority here argues that Breyer did not reject the dissenter's remedial approach in all cases. Nonetheless, Breyer's opinion did not approve the approach advanced by the majority here and specifically rejected engrafting subsequent jury sentencing as an appropriate solution to Sixth Amendment problems absent any statutory support. *Id.* at 250–58, 125 S.Ct. 738. Here, the majority has taken more liberty in reconstructing a statute than the *Booker* majority and has not distinguished our situation from that in *Booker*. Thus, although invoking *Booker* to support its decision to reinterpret the statute, by including the dissenter's rejected solution, the majority fails to follow Breyer's severance policies.

The majority here renders Colorado's death penalty statute constitutional through severance as Breyer did *and* engrafts a jury sentencing scheme as Stevens suggested in an effort to intuit what the General Assembly would have intended. This additional step of post-severance reinterpretation takes our severance doctrines further than we have ever gone before when eliminating unconstitutional language. *See People v. Powell,* 716 P.2d 1096, 1102 (Colo.1986) (refusing to imply the word "and" because additional severance was more appropriate).

Reinterpretation post-severance not only expands our authority to construe statutes, this particular reinterpretation conflicts with our recent precedent rejecting subsequent jury sentencing in *People v. Lopez,* 148 P.3d 121 (Colo.2006). In *Lopez*, the defendant pleaded guilty and received an aggravated sentence imposed by a judge. We held that under Colorado law a defendant who has pleaded guilty may not face a sentence greater than the statutory maximum based on subsequent jury findings. 148 P.3d at 125. Death is an aggravated sentence requiring further jury fact-finding to determine death eligibility by weighing aggravating and mitigating factors and then making a final death sentence determination. § 18–1.3–1201. Thus, the only way to constitutionally impose death after a defendant pleads guilty is by jury fact-finding subsequent to a guilty plea. The statute does not provide for jury sentencing and judicially creating jury sentencing is inconsistent with our jurisprudence. *See Lopez,* 148 P.3d at 125.

We have rejected, along with the Supreme Court in *Booker*, subsequent jury sentencing. Thus, *Booker* fails to provide the majority with a valid justification for post-severance reinterpretation of the death penalty statute. Similarly, the specter of the constitutional concerns raised in *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, also fall far short of providing a valid justification for adding a subsequent jury sentencing procedure.

## B. The Right to a Jury Trial is not Chilled

The majority declines to apply the plain meaning of the remaining statutes to avoid what it identifies as a constitutional problem arising from a "narrow" interpretation. The majority argues that if a defendant were permitted by the district attorney to plead guilty and avoid death, the statutory scheme would create a facially unconstitutional two-track penalty scheme prohibited by *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138. Maj. op. at 504–05. This concern is unfounded.

*Jackson* held that a statute permitting a defendant to plead not guilty and face death, but plead guilty and guarantee a life sentence, unnecessarily chills a defendant's right to insist that a jury find him guilty. 390 U.S. at 583, 88 S.Ct. 1209. However, under Colorado law, a defendant may not plead guilty without the consent of a prosecutor. § 16–7–206(2). A guilty plea with the prosecutor's consent, where the plea results in a life sentence, is an agreement to a life sentence and is indistinguishable from constitutionally permissible plea bargaining. In this crucial respect, our post-severance death penalty statute does not resemble the federal statute struck down in *Jackson*.

In *Jackson*, the Federal Kidnapping Act under review exposed a defendant to the death penalty if he pleaded not guilty, but a defendant could automatically avoid death by pleading guilty. 390 U.S. at 581, 88 S.Ct. 1209. Plea bargaining was not addressed; however, as later decisions have shown, it was the *automatic* provision of life that needlessly encouraged guilty pleas, not the fact that guilty pleas often reflect a desire to avoid the death penalty. *Id.* at 583, 88 S.Ct. 1209; *see Brady v. United States*, 397 U.S.

742, 747, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (limiting *Jackson* and holding that guilty pleas encouraged by the fear of a possible death sentence are constitutional); *North Carolina v. Alford*, 400 U.S. 25, 37–39, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (a defendant may reasonably choose to plead guilty, even when asserting their actual innocence, to avoid a harsher penalty).

The holding in *North Carolina v. Alford* is instructive here. In *Alford*, the Supreme Court allowed a defendant to plead guilty to a crime without admitting guilt. 400 U.S. at 27–29, 91 S.Ct. 160. Thus, a life sentence agreed to by a district attorney and by a defendant as part of a plea bargaining process to avoid the death penalty is constitutional. *See id.* at 38, 91 S.Ct. 160. Furthermore, there is no practical way that a defendant could be unconstitutionally encouraged to plead guilty under Colorado law that is in any way distinguishable from normal, permissible, plea bargaining. *See id.* at 37, 91 S.Ct. 160 (distinguishing *Jackson:* "the Constitution is concerned with the practical consequences, not the formal categorizations of state law."). Thus, so long as the district attorney agrees to a guilty plea knowing that a life sentence is the maximum sentence the court can impose, plea bargaining to avoid the death penalty is constitutional.[2]

In Colorado, where the prosecutor has the discretion to take death off the table at any time, and the parties may engage in plea negotiations where death is a threat and a life sentence is offered in exchange for a guilty plea, the plain meaning of the severed statute presents no chill on the right to a jury trial. *See People v. Schneider*, 25 P.3d 755, 759 (Colo.2001) ("Plea bargains pursuant to which a defendant pleads guilty in ex-

**2.** The Supreme Court noted when it decided *Alford* that North Carolina, at that time, no longer permitted guilty pleas in capital cases. 400 U.S. at 39 n. 12, 91 S.Ct. 160. The Court made no further comment on the permissibility of a statute forbidding guilty pleas, nor does current Supreme Court jurisprudence appear to prevent such a law. Thus, there appears to be no constitutional problems with forcing a defendant to go to trial in a capital case. Furthermore, under North Carolina's current death penalty statute, a defendant and the State may agree to life impris-

onment for a capital crime and the judge is required to impose a life sentence, exactly as our death penalty statute provides for here, post-severance. N.C. Gen.Stat. § 15A–2001 (2006). When interpreting their statute, the North Carolina Supreme Court declined to alter the statute in any way: "it is not within this Court's constitutional powers to disregard [existing statutory provisions] and to legislate others." *State v. Smith*, 352 N.C. 531, 532 S.E.2d 773, 787 (2000), *cert. denied*, 532 U.S. 949, 121 S.Ct. 1419, 149 L.Ed.2d 360 (Mar. 26, 2001).

change for charging or sentencing concessions from the District Attorney are an accepted part of our jurisprudence and are specifically sanctioned by statute, court rule and case law."). Any resulting concerns raised by *Jackson* are therefore either absent or unconvincing.[3] *See Alford*, 400 U.S. at 38–39, 91 S.Ct. 160 (rejecting *Jackson* and holding that forcing a defendant to choose between a guilty plea or a trial is constitutional).

However, even if the majority were correct in its analysis, we have never used the doctrine of constitutional avoidance to avoid a constitutional problem of our own creation, and for good reason. Were we to adopt such a policy in future cases, where the stakes were not so high as they are here, we could re-write whole sections of Colorado law every time they run afoul of constitutional principles. By asking, "What would the General Assembly do?", and then answering it for ourselves by reinterpreting a statute, we invite the criticism of judicial overstepping by fashioning a remedy not provided for by the statute. Even the *Jackson* decision forcefully rejected subsequent jury sentencing as an appropriate remedy:

> It is one thing to fill a minor gap in a statute—to extrapolate from its general design details that are inadvertently omitted. Is quite another thing to create from whole cloth a complex and completely novel procedure and to thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality.

*Jackson*, 390 U.S. at 576–77, 88 S.Ct. 1209; *see Booker*, 543 U.S. at 246, 125 S.Ct. 738 (rejecting subsequent jury sentencing).

The majority is therefore left with little support for its general decision to reinterpret the death penalty statute or its specific choice of creating a subsequent jury sentencing procedure. Furthermore, the majority's reinterpretation is not supported by the language of the statute. The words "trial jury" clearly refer to the jury imposing the verdict of guilt. The provisions relating to alternate jurors would make little sense otherwise. For example, in section 1201(1)(a), trial jury unambiguously means the jury rendering a verdict of guilty: *"If the verdict of the trial jury is that the defendant is guilty of a class 1 felony, the alternate jurors shall sit as alternate jurors on the issue of punishment."* § 18–1.3–1201(1)(a) (emphasis added). Further, the rest of the language in the statute, providing for the replacement of jurors who sat during the guilt phase with alternate jurors, becomes at least superfluous, if not incomprehensible. While I agree that the words "conviction of guilt" could reasonably be interpreted, if necessary, to mean a guilty plea, the same is not true of "trial jury" and subsequent sentencing jury.

The majority has reinterpreted the statute in a way inconsistent with the rest of the language of the statute, but the majority also fails to convincingly explain its view that this is the legislation the General Assembly would have chosen. What is very clear from the history of the death penalty in Colorado is that jury sentencing was the decidedly disfavored method of imposing death. *See Woldt v. People*, 64 P.3d 256 (Colo.2003) (holding Colorado's three-judge-panel system unconstitutional pursuant to *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)). The General Assembly might have

3. The majority also relies on *Hynes v. Tomei*, holding that New York's death penalty statute was unconstitutional pursuant to *Jackson* because it permitted a defendant to avoid the death penalty by pleading guilty. 92 N.Y.2d 613, 684 N.Y.S.2d 177, 706 N.E.2d 1201, 1209 (1998). However, the New York court acknowledged that a defendant's guilty plea resulting in a life sentence, made as the result of a plea bargain before the prosecutor announced any intent to pursue the death penalty, was perfectly valid. *Id.* Furthermore, *Hynes* explicitly observed that *Jackson* may not be valid in light of modern "plea bargaining and substantial changes in the administration of capital punishment." *Id.* Because I am unconvinced that an arbitrary line drawn prior to notice of intent to seek death which rejects the practical way in which plea bargaining actually occurs is required by *Jackson* or its progeny, and because I agree with *Hynes* that the Supreme Court's acceptance of plea bargaining changes the reach of *Jackson, id.,* I find that *Hynes* offers little support for the majority's rejection of the plain meaning of the statute after severance. The majority here implicitly recognizes, and I agree, *Jackson* is limited to the holding that defendants should not be needlessly required to waive constitutional rights through the automatic linking of a plea and the right to a jury.

decided to permit pleas of guilty only as part of a plea agreement to a life sentence. Therefore, in light of other reasonable alternatives, "legislative intent" does not support the particular reinterpretation chosen by the majority.

In choosing its remedy, the majority claims to be guided by the general legislative intent to have a valid death penalty. However, what is at issue is not a broad, underlying intent, but instead the particular method the General Assembly has chosen to implement its desire to have a valid death penalty statute. In my view, only the General Assembly can write a statute determining the methods through which a defendant may face death. *See Woldt,* 64 P.3d at 270–72 (determining that a subsequent jury sentence of death was not a permissible remedy for ex post facto reasons and therefore the existing sentencing statute for class one felonies, authorizing life imprisonment, is the only statute that may be applied).

The judiciary has no power to impose a sentence not authorized by statute. *Roberts v. People,* 130 P.3d 1005, 1007 (Colo.2006). We also do not add language to a statute. *See People v. Cross,* 127 P.3d 71, 73 (Colo. 2006). Together, these two fundamental rules limit our authority to dictate to a sentencing court the range of possible sentences it may impose on remand. We have no power to authorize a sentence when a statute does not expressly authorize it and thus we have no power to reinterpret a statute to authorize a new sentencing procedure.

I believe that the statute is unambiguous and complete as written; post-severance reinterpretation is therefore unnecessary.[4] Even if further interpretation were necessary I would not find that "trial jury" means a sentencing jury empanelled solely to determine whether or not the defendant should be put to death. The proper remedy is to follow the plain language of the remaining statutes as they exist post-severance and impose a life sentence.

### III. Montour's Sentence on Remand

The majority has chosen to re-sentence Montour in front of a jury who may consider the death penalty. In doing so, it relies on the language of section 18–1.3–1201(7)(b), C.R.S. (2006).[5] To validate a new sentencing hearing in Montour's case, it resorts to the same justifications relied on to reinterpret subsection 1201(1)(a). First, it finds unconstitutional language in subsection 1201(7)(b), "pled guilty or," and severs it. Maj. op. at 505–06. Next, it reinterprets the statute to mean that "a newly impaneled jury" means subsequent sentencing jury. Maj. op. at 506. However, nothing in the plain language of subsection 1201(7)(b) implies that all or any defendants who *pleaded guilty* should therefore have a "newly impaneled jury." The majority's revision of subsection 1201(7)(b) creates jury sentencing where none previously existed, just as it does in subsection 1201(1)(a). Thus, my objections to the reinterpretation of subsection 1201(1)(a) apply

4. The majority also argues that the statute would be incomplete without further interpretation. Maj. op. at 504. However, as I have already explained, the absence of a sentencing provision when a defendant enters a guilty plea does not render the statute incomplete or incoherent because section 16–7–206 addresses guilty pleas in all cases, including capital cases. Further, after entry of a guilty plea, sentencing is authorized, as the majority correctly notes, by section 18–1.3–401(4)(a).

5. This section reads:

If any death sentence is imposed upon a defendant pursuant to the provisions of this section and, on appellate review including consideration pursuant to subsection (8) of this section, the imposition of such death sentence upon such defendant is held invalid for reasons oth-

er than unconstitutionality of the death penalty or insufficiency of the evidence to support the sentence, the case shall be remanded to the trial court to set a new sentencing hearing before a *newly impaneled jury* or, if the defendant [words severed] waived the right to jury sentencing, before the trial judge; except that, if the prosecutor informs the trial court that, in the opinion of the prosecutor, capital punishment would no longer be in the interest of justice, said defendant shall be returned to the trial court and shall then be sentenced to life imprisonment. If a death sentence imposed pursuant to this section is held invalid based on unconstitutionality of the death penalty or insufficiency of the evidence to support the sentence, said defendant shall be returned to the trial court and shall then be sentenced to life imprisonment.
§ 18–1.3–1201(7)(b) (emphasis added).

equally to any reinterpretation of subsection 1201(7)(b).

Furthermore, because Colorado has no history or procedure for separate jury sentencing, the majority's resolution spawns issues that should be resolved by the General Assembly. *See Lopez,* 148 P.3d at 126 (noting that Colorado has never sanctioned the imposition of a harsher penalty by supplementing a plea with subsequent jury findings of aggravated facts). Instead, those issues will be resolved by the trial courts without any guidance. For example, the sentencing judge must determine the proper method to select a jury and the proper grounds to challenge a juror "for cause" when the only issue is whether the defendant will face life imprisonment or death. The creation of totally new sentencing procedures should be left initially to the General Assembly. Thus, the plain language of the existing statutory scheme should be followed. Those statutes require that on remand, Montour be re-sentenced to life imprisonment. *See Woldt,* 64 P.3d at 272 (declaring judge imposed death sentences unconstitutional and remanding for imposition of a life sentence).

## IV. Conclusion

The majority, by severing the unconstitutional language from the statute, creates the alleged unconstitutional infirmity justifying its extraordinary measure of engrafting the jury-sentencing procedure. Additionally, the constitutional infirmities identified by the majority are unconvincing under Colorado's plea bargaining and statutory sentencing schemes. Finally, its remedy has been rejected by the United States Supreme Court, rejected recently by us, and is unwise considering the jurisprudential considerations that underlie the limitations on the judiciary's power to change legislative acts.

Though my approach to severance would not be a satisfactory answer to those who prefer that we create a constitutional death penalty statute that still applies to Montour after his sentencing pursuant to an unconstitutional statute, legislative action by the General Assembly is the process that our system of separation of powers, checks and balances, and democratic leadership by the People re-

quires. I therefore concur with the majority's opinion and judgment that the death penalty statute is unconstitutional, but I do not agree with its remedial analysis. Accordingly, I respectfully dissent.

Justice COATS, dissenting.

Because I object to almost every aspect of the majority opinion, from its jurisdictional explanation to its remedy, I respectfully dissent. There are, however, four specific points in the analysis upon which I will comment, in the hope that they will be carefully scrutinized before any attempt is made to extend the majority's rationale beyond its precise application to this case.

First, and central to its determination that the statute as written is unconstitutional, is the majority's notion that a capital defendant must be entitled, at his choice, to waive jury findings as to some, but not all, of the facts necessary to establish his eligibility for a death sentence. As I understand it, this position is premised on a combination of recent United States Supreme Court jurisprudence entitling a criminal defendant to jury findings of any facts increasing his penalty beyond that permitted by a guilty verdict alone, *see United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and the majority's own belief that a capital defendant's interest in pleading guilty to a capital offense is such that conditioning his plea on his accession to judicial fact-finding at the sentencing phase renders his knowing and intelligent waiver of jury sentencing ineffective. Were it the case that capital defendants actually had a constitutional right to demand acceptance of their guilty pleas, I might be forced to agree. That, however, is clearly not the case.

While the legislature cannot order the imposition of a death penalty in a manner that needlessly penalizes the assertion of a constitutional right, it is well-established that a defendant has no constitutional right to insist that he be tried by a judge rather than a jury or that his guilty plea be accepted by a court. *United States v. Jackson,* 390 U.S. 570, 583–84, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)

(relying on *Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) and *Lynch v. Overholser*, 369 U.S. 705, 719, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962)). In light of constitutional limitations on twice placing any person in jeopardy for the same offense, it should be patent that a criminal defendant could not possibly have a right to plead guilty to an offense that is less serious than, but the elements of which are included within, the charges brought against him.

In finally arriving at its articulation of the very right to jury sentencing upon which the majority now relies, the United States Supreme Court carefully explained that whenever the existence of a fact is essential to make available a sentence beyond the statutory maximum available for conviction alone, it is of no consequence whether the legislature chooses to characterize that fact as a sentencing factor or as an element of a greater offense. *Apprendi v. New Jersey*, 530 U.S. 466, 494, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In either case, for purposes of the defendant's right to a jury trial, the legislature has effectively created a greater and lesser-included offense. In fact, this court has expressly relied on the Supreme Court's equation of elements and sentencing factors in this context for the proposition that a defendant's right to jury fact-finding in sentencing can be waived only in a manner sufficient for the waiver of a personal constitutional trial right. *People v. Isaacks*, 133 P.3d 1190, 1194–95 (Colo.2006) (requiring a voluntary, knowing, and intelligent waiver).

The majority holding therefore effectively mandates that a defendant be permitted, by pleading guilty to the statutory elements of first degree murder alone, to avoid a jury determination that he committed a capital offense and, at the same time, retain the right to insist on a jury determination of all additional facts essential for a death sentence. In light of jeopardy considerations barring the subsequent prosecution of a defendant for an offense greater than the one to which his guilty plea has already been accepted, the Supreme Court's holdings in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Blakely* would, if anything, seem to dictate precisely

the opposite result and actually preclude guilty pleas in capital cases unless they include a simultaneous admission, or at least accession to judicial findings, of any additional facts qualifying the defendant for a death sentence. *Cf. People v. Lopez*, 148 P.3d 121 (2006).

As the majority appears to acknowledge, there can be no doubt whatsoever that the defendant in this case was advised and understood that he would not be permitted to waive his right to a jury trial and enter a guilty plea, without also waiving his right to jury sentencing. Although at times the majority appears to concede that a capital defendant has no right, either constitutional or statutory, to plead guilty to a capital offense, it nevertheless holds that conditioning this tactically advantageous maneuver on the defendant's willingness to waive his right to a jury determination of the final "elements" of a death sentence, just as he is required to do with regard to the elements of capital murder, in some way renders his waiver involuntary. Should the majority really intend that the exercise of a constitutional right is impermissibly burdened by requiring its waiver as a condition of accepting a guilty plea, then plea agreements could not exist. I therefore believe the majority's rationale for reversing the defendant's death sentence and severing portions of the statute to be internally inconsistent and fatally flawed.

The second of my objections concerns the majority's refusal to apply our previous interpretations of *Blakely* in the capital sentencing context. As the majority acknowledges, we have categorized prior convictions as *Blakely*-exempt facts and have held the existence of a *Blakely*-exempt or compliant fact sufficient to justify an enhanced sentence, thereby opening the sentencing range to additional fact-finding by the sentencing authority, whether or not the defendant has waived his right to jury findings of additional facts. *See DeHerrera v. People*, 122 P.3d 992 (Colo.2005); *Lopez v. People*, 113 P.3d 713 (Colo.2005). It is undisputed that the defendant here had been previously convicted of a class 1 violent felony; that this fact provided sufficient aggravation to support a death sentence; and that the defendant was charged,

among other things, with this specific aggravating factor.

Nevertheless, the majority declines to apply our *Blakely* jurisprudence to capital sentencing on the grounds that aggravating factors, although necessary, are insufficient for eligibility for a death sentence until they have been weighed against any mitigation offered by the defendant. Both *Ring* and *Blakely,* however, make clear that it is only findings of fact required for an enhanced sentence as to which a defendant is constitutionally entitled to a jury determination, not the evaluation whether, in the totality of the circumstances, they are sufficiently aggravating to actually merit imposition of the enhanced sentence. We have expressly rejected virtually the identical proposition outside the capital sentencing context, instead characterizing the evaluation of all aggravating and mitigating evidence as something other than a finding of fact. *See Lopez,* 113 P.3d 713. I fail to see any logical or principled basis for radically reinterpreting *Blakely* when applying it in the context of capital sentencing.

Third, I take exception to the majority's remedy of ordering that a new jury be empanelled solely for the purpose of sentencing. While it may be fair to assume, from the statutory provision for empanelling a new sentencing jury following reversal of a death sentence, that the legislature would not have chosen to simply default to a life sentence in the event its provision for guilty pleas were struck down, it is abundantly clear that it expressly chose not to apply its provision for resentencing by a separate jury to guilty pleas. In fact, the severed provisions of the statute unmistakably evidence a legislative intent that capital defendants not be permitted to plead guilty at all, without forgoing whatever right they may have had to jury sentencing.

For reasons largely identified by the partially concurring and partially dissenting opinion of Justice Martinez, I consider the majority's reinterpretation of the unsevered portions of the statute to be so contrived as to amount to a judicial rewriting of the statute. Although I do not believe the legislature's provision for judicial sentencing following guilty pleas must be severed from the statute in the first place, I nevertheless believe that if that provision is severed, the statute cannot be construed to provide for a death sentence following a guilty plea. Because, however, defendants have no constitutional right to the acceptance of their guilty pleas, and by statute may enter a guilty plea only with the consent of both the prosecution and court, I believe the necessary effect of the majority's severance is to limit guilty pleas for capital offenses to those cases in which the prosecution is willing to abandon capital sentencing altogether.

Whether or not the remaining language of the statute could, as the majority holds, be understood in future cases to treat the reversal of a death sentence following a guilty plea as if it followed a jury conviction, I do not believe that remedy could apply here. It was an express condition of the defendant's plea, to which he agreed and upon which the state relied in consenting to the plea, that along with his other trial rights the defendant would waive any right he might have to jury sentencing. He was so advised, and he willingly and advisedly proceeded with the plea. If, as the majority holds, he has now successfully established that his waiver was ineffective, then the conditions upon which the guilty plea was predicated were not fulfilled, and the People must be given the opportunity to withdraw from it and subject the defendant to trial before the same jury of both his guilt or innocence and his sentence.

Finally, I object to the majority's treatment of this constitutional ground for reversal as falling within the scope of our statutorily-mandated review of the propriety of a death sentence. I object to this treatment both because I consider it thoroughly unconvincing and because I consider it a transparent attempt to circumvent the legislature's time limitations for presenting a unitary appeal to this court in capital cases. §§ 16–12–208(3), –209, C.R.S. (2006). By imposing a separate, statutory obligation on this court to notice and resolve any constitutional issues concerning the sentencing statutes and procedures of this jurisdiction, whether or not they were timely raised (or raised at all for that matter), the majority not only relieves

capital defendants of any obligation to bring such constitutional challenges to the attention of the state courts but apparently relieves the federal courts of any obligation to find cause and prejudice for a procedural default before independently considering such issues in petitions by state prisoners for federal writs of habeas corpus.

There can be no serious question that the appropriateness, or propriety, of a sentence refers in this jurisdiction to an exercise of discretion in choosing a particular sentence among legally acceptable options and according to legally acceptable procedures. I presume therefore that the majority attempts so mightily to squeeze its constitutional theory under the rubric of "propriety" to avoid addressing the nearly four-year hiatus between imposition of the defendant's death sentence and the final submission of appellate briefs on his behalf; as well as this court's repeated rejections of the defendant's waiver of his appellate rights, until he could finally be convinced to move for the withdrawal of his waiver and for permission to file a direct appeal, some three years out of time. Whatever may be the independent authority of the judiciary to determine the timing of appellate remedies in capital cases, the legislature clearly did not intend to abrogate the obligation of capital defendants to challenge the constitutionality of death sentences by subsuming such matters in an automatic review by this court.

Because I would also find no impropriety in the trial court's imposition of the defendant's sentence, I would affirm it. I therefore respectfully dissent.